STATE v. HERBERT G. GALLEHUGH.[1]

May 8, 1903.

Nos. 13,314—(8).

## Homicide—Self-Defense.

Defendant was prosecuted for the wilful murder of C. The homicidal act was admitted, but excused upon the justification of self-defense; defendant claiming that he had received information that C. had grossly insulted his wife, and he proposed to inflict personal chastisement upon him therefor; that in attempting to execute this intention upon the person of C., but with no design to take his life, he discovered that the latter was approaching him, armed with a deadly weapon, under circumstances which justly excited the belief that his own life was in danger, and, being influenced by fear for his safety, he shot and killed C. Testimony for the defense was received which supported this claim. There was also evidence for the state tending to show that C. was unarmed, and that defendant was in no danger of grievous bodily harm from deceased, which presented a question of fact for the jury. Upon this conflict, *held*, that the verdict, finding defendant guilty of murder in the second degree, is supported by the measure of proof required to sustain a conviction in criminal cases.

## Res Gestae.

When defendant had shot and killed the deceased, he left the place of the homicide. Shortly afterwards the police arrived upon the scene, and it was proposed to show that defendant's wife then made a statement asserting that the victim of the homicide had a knife in his hand, which she had seen during the transaction. This was excluded. *Held*, that such narration of a past transaction was not a part of the res gestæ, and was inadmissible.

## Evidence.

Witnesses for the state, who testified that they had seen the homicide, were asked on rebuttal, for the purpose of impeachment, whether, when asked, "Who saw the shooting?" by the police officers, one of them had pointed to another person and said, "She saw it," while the other remained silent. *Held*, that this evidence was not a substantial contradiction of the testimony of the witnesses sought to be impeached, or reasonably tending to contradict their account of what previously occurred.

[1] Reported in 94 N. W. 723.

**Same—Rebuttal.**

The victim of the homicide was a colored man. Defendant, a white man, testified in his own behalf that he had not stated that "he would just as lief kill a black devil as not," but made voluntary explanation as to what he did say in a conversation had with his wife during the previous afternoon. On rebuttal, witnesses who heard this conversation were permitted to state that defendant did make the obnoxious statement referred to. *Held*, that the admission of this evidence was proper rebuttal, and tended to show the intent of defendant.

**Qualification of Juror.**

Upon motion for a new trial, affidavits were offered and received to show that one of the jurors had expressed hostile feelings to the defendant, which would have properly justified his exclusion from the panel. These affidavits were fully met and answered by the affidavit of the juror himself, which presented an issue of fact. *Held*, that the trial court did not abuse its discretion in the determination of this issue in favor of the state.

Appeal by defendant from an order of the district court for Hennepin county, Simpson, J., denying a motion for a new trial, after a trial and conviction of murder in the second degree. Affirmed.

*T. A. Garrity*, for appellant.

*W. B. Douglas*, Attorney General, *F. H. Boardman*, County Attorney, and *C. S. Jelly*, Assistant County Attorney, for the State.

LOVELY, J.

Defendant was prosecuted upon an indictment charging murder in the first degree, for having feloniously killed one Charles Collins by shooting him with a revolver in the city of Minneapolis on March 7, 1902. At the trial the homicidal act was admitted, but excused on the claim that the killing was in self-defense. After submission of the cause to the jury upon instructions defining the degrees of homicide, defendant was convicted of murder in the second degree, and sentenced to imprisonment for life. Upon a settled case containing the entire evidence, a motion for a new trial was made, based upon alleged errors of the court in the exclusion of testimony, and upon affidavits to show that one of the jurors was disqualified to sit in the case. The motion was denied, and defendant appeals.

Collins, the victim of the homicide, was the colored chef of the San Angelo Hotel, in Minneapolis, and was shot and killed by defendant while engaged in serving supper in the kitchen of that building. Defendant, a white man twenty-five years of age, not connected with the hotel, was at the time paying a visit to his wife, who was employed as a domestic therein. The circumstances attending the homicide were witnessed by three female employees of the hotel, who were present in the kitchen at the time, and were examined as witnesses for the state. One of them (Martha Olson) stated: That she went into the kitchen with a tray of dishes about seven o'clock in the evening. That defendant was there, seated, talking privately with his wife. Collins was standing a few feet from defendant, on the other side of an intervening table, at the range, getting an order ready. That his back was toward the defendant, when the latter suddenly arose, left his wife, stepped to the table, and said to Collins, "Come here." The chef turned, and in reply said, "Why, what do you want?" Defendant then pulled a revolver from his right hip pocket and said, "Take your place." Mrs. Gallehugh (defendant's wife) then rushed forward, threw her arms around her husband, and said, "Don't! Don't!" Collins in the meantime advanced to defendant, who within four or five seconds fired. Collins received the shot, and instantly fell to the floor. Defendant then stooped over the fallen man and shot him the second time where he lay. The witness then left the room. As she did so she saw defendant run out of the kitchen without his hat, which had fallen from his hand. She further stated that she distinctly saw the hands and actions of both parties during the whole transaction; that at no time was Collins armed with any weapon; that defendant had the revolver in his hand before he made the demands upon his victim to "come here" and "take your place." The testimony of this witness was corroborated in every material respect by two other domestics who were in the kitchen, each stating positively that Collins was unarmed, and did not have a knife in his hand.

The defendant and his wife testified that the deceased had a knife in his hand, which fell upon the floor as he dropped. There is no intimation by any one else, including others who came into

the room soon afterwards, that any knife was found upon the floor, while one of them positively denied that any such weapon was there. The narrative of previous events upon which defendant relied in justification of his conduct was given at the trial by himself and his wife, in which it was stated substantially by each: That, on the day previous to the shooting, Mrs. Gallehugh was assaulted in the laundry and insulted by Collins. That on the day after this assault, during the afternoon, defendant called upon his wife, and stayed with her a short time in the quarters occupied by the female help. At this time she did not inform him of the occurrence in the laundry, but did tell him that a previous indecent proposition had been made to her by Collins. That in the presence of some of the female employees a statement was made that colored male sevants of the hotel had chased some of the white girls who worked there, which led the defendant to make remarks in connection therewith, but he left his wife after a visit of some ten minutes, and returned about seven o'clock in the evening to bid her good-by, as he was going to Chicago. He then went into the kitchen, where his wife, the chef, and several girls were at work, engaged in serving supper for the guests of the hotel. Mrs. Gallehugh said to her husband, shortly after he came in, that she did not want to work at the place any longer, and would tell him the reason why as soon as she could. That within fifteen minutes afterwards, and while defendant was seated, she came to him, and gave the specific details of the injury she had suffered at the hands of the chef in the laundry, when defendant became so enraged that he rose with the fixed purpose of inflicting personal chastisement upon Collins, or, to use his own language, "to give him the best thrashing he ever had in his life," but without the intention of shooting him. With this purpose only, he says, he called out, "Come here." At this time Collins was seated at the table, watching him; and, when the latter said "Come here," the chef rose, and moved around the table until he was three or four feet distant. Mrs. Gallehugh, as she states, saw that her husband was excited, and, discovering that Collins had a knife in his hands, threw her arm around her husband and exclaimed, "Don't! Don't!" Defendant says he then discovered the knife,

which he describes minutely, and, under fear that he would be injured, pushed his wife away, pulled his revolver from his right hip pocket, and fired two shots into the body of the deceased while he was standing in front of him.

As indicated above, in the respective claims of the prosecution and defense there were decided and material variances. On the one hand, the aggressor in every respect was the defendant, who was in no danger of being stabbed by Collins, but whose apparent purpose was to take the life of an unarmed man, while, upon the other hand, the purpose of defendant went no further than to commit a battery upon the colored cook for the assault and insult he had previously offered to his wife. There is evidence in the record to support either theory, and it was obviously the duty of the jury, upon the fair and impartial presentation of the law in the instructions given by the learned trial court, to which no exceptions were taken, to determine, upon this conflict, the guilt or innocence of defendant under the rules applicable to criminal cases; and with the result we have no authority to interfere, unless the defendant's rights have been prejudiced by the errors assigned in excluding evidence offered in his behalf, or the refusal to set aside the verdict upon the ground that an incompetent juror was accepted, and allowed to participate in the trial.

It was assigned as error that the wife of defendant was not permitted at the trial to testify that a short time—some six minutes—after the killing, and after her husband had left the building, she stated to a member of the police force who arrived on the scene that deceased had a knife in his hand when he approached her husband. The excluded evidence in this respect obviously could not have had greater weight than to corroborate her previous statements, already given under oath, to the effect that she saw the knife in Collins' hands when he came around the table. But it is urged that such rejected matter was a part of the res gestæ, or part of the main transaction in which her husband participated. We think the court properly refused to receive the excluded statement. What Mrs. Gallehugh stated about the transaction after it was over was no part of it, or of any of the undesigned incidents of the particular act for which defendant

was prosecuted; nor do we think that it was reasonably illustrative thereof. It was, at best, a narrative of a past transaction, which the witness had already testified to. While it might afford an inference on the argument that she would not, so soon after the killing, have referred to the knife, if she had not seen it, and it had not been in her mind at the time, it partakes, however, of the character of a self-serving and doubtful confirmation by herself of what she had already stated, because she repeated it again to third parties, which, upon the most substantial grounds, is not permissible as a part of the res gestæ. Jones, Ev. §§ 348–366; Conlan v. Grace, 36 Minn. 276, 30 N. W. 880.

It was attempted to impeach the testimony of two of the female witnesses who testified to the incidents of the homicide by showing that when the police arrived at the scene the question was asked generally of those present, among whom were these girls, by Officer Brackett, "Who saw the shooting?" and that one of them pointed to Martha Olson, and said, "She saw it," while the other remained silent. It is insisted that neither of these young women would have pursued this course if they had themselves witnessed the whole transaction, as each had testified. Conceding, which is doubtful, that the foundation had been laid to contradict the denial of these witnesses that such declaration had been made, we are unable to adopt counsel's inference that if one of these witnesses pointed to Martha Olson, and the other remained silent, either act was inconsistent with their previous evidence, in which each gave a full and detailed narration of the transaction, or was equivalent to a statement by either that she did not see the shooting; and we discover no merit in these assignments.

It is urged that the court erred in permitting one of the witnesses (Emma Anderson), who was present at the conversation between defendant and his wife on the afternoon of the day of the homicide, upon being called in rebuttal, to answer the following question:

"During the conversation there between his (defendant's) wife and himself, did you hear him say, 'I would just as soon shoot a black devil as not'?"

To understand the relevancy of this assignment, it is necessary to state that counsel for the accused, on his direct examination, had asked him whether, at the time referred to, he had made a statement that he "would just as lief kill a black devil as not, or words substantially to that effect," to which he replied that he did not. Immediately previous to the time referred to, defendant's wife had told him that two colored men had chased two white girls who had come running into the servants' quarters, and told her of it. Defendant explained, in this connection, and in reference to this matter,

"I spoke up and told them [his wife and other domestics] if that had been in the South, I said, they would certainly hang for it."

There was also evidence that defendant's wife had told her husband at this visit that she had received improper proposals, affecting her honor, from Collins, some days before; and the evidence in rebuttal, assigned as error, was to contradict the denial of defendant that he had used what was evidently regarded as language indicating a hostile feeling to the deceased on account of his color.

Ordinarily it would be sufficient to say in answer to this claim of error that the voluntary denial of the use of the language, to which defendant's counsel attached sufficient importance to justify its contradiction, would authorize the admitted evidence; but, further than this, the relation of the defendant to the deceased became, in view of what he had already been told of the conduct of the latter in connection with the detailed statement he received from his wife at the time of the killing, of some materiality, to characterize his intent, engendered by a specific antipathy towards the race to which deceased belonged, sufficient to authorize its admission to show malice, and whether he was, as he claimed, merely disposed to commit a battery, only, or the deed for which he was prosecuted.

Lastly it is assigned as error that the court refused to grant a new trial upon the ground that one of the jurors entered upon the trial of the cause with a fixed opinion of defendant's guilt. The showing upon this contention was presented to the court by

affidavits of persons who claimed to have had conversations with this juror prior to the time he was summoned on the panel. In opposition to these affidavits, the state produced the affidavit of the juror himself, in which he, at length and in detail, decidedly contradicted and denied the statements attributed to him in the affidavits made in support of the motion. It has been often held that courts of review will not consider the grounds of decision by the trial court upon an issue of this kind where the affidavits tending to show the previous bias of the juror are met and contradicted by the juror himself. Hilliard, New Trials, 47, and cases cited. The most that can be claimed for defendant upon this assignment is that the showing made in behalf of the juror's qualifications was not so palpably against the weight of evidence that it abused its discretion in denying the motion. We have considered the affidavits, and, upon a careful examination of their contents and purport, are required to say that we are satisfied that we would not be justified in holding that the court below abused its discretion in this respect.

We have given to the examination of this record careful and patient attention, since the result is of the most serious consequence, and have reviewed every question presented, without regard to the real, substantial importance of several assignments which are exceedingly technical, and are constrained, in conclusion, to say that upon the issue as distinctively made by defendant, through which he presented his justification of self-defense, the evidence amply supports the verdict; and we are unable to find any prejudicial ruling of the trial court against him upon the alleged grounds wherein he challenges our judgment.

The order of the trial court must be affirmed.